No. 33,095

G. H. Hawkins, *Appellee*, v. Shell Petroleum Corporation, *Appellant.*

(62 P. 2d 833)

Opinion filed December 12, 1936.

*Albert Faulconer, Kirke W. Dale, C. L. Swarts,* all of Arkansas City, *Joe T. Dickerson, George W. Cunningham* and *F. C. Love,* all of Tulsa, Okla., for the appellant.

*W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *William E. Cunningham,* all of Arkansas City, for the appellee.

The opinion of the court was delivered by

Burch, C. J.: The action was one for breach by defendant corporation of a contract made by its agent to employ plaintiff. Plaintiff recovered, and defendant appeals. Two questions are presented: Was there a contract, and if so, did the agent have authority to make the contract? The last question only will be considered.

At the trial plaintiff testified, called one witness, and rested. A demurrer to plaintiff's evidence was interposed, which should have been sustained, but was overruled. Defendant produced its testimony. Defendant then fixed the true date on which the contract was made, and the case went to the jury. With a general verdict for plaintiff, the jury returned answers to special questions. Motion was made to set aside the answers on which the verdict and judgment rest, and the motion was denied.

Plaintiff had no evidence to establish authority of the agent to make the contract sued on, and if authority existed, it must be made out from the testimony for defendant, read with the testimony for plaintiff.

Defendant maintained and operated an oil refinery at Arkansas City, and employed, as needed, from 350 to 500 men. Men quit work, men were discharged, and many men sought employment. Hundreds of men went into and out of employment and a system was adopted for supplying the company's need for labor, which prevailed notwithstanding change in administrative personnel.

A. A. Buzzi had duties to perform in connection with employment of labor. He bore the title of chief clerk, and had an office at the refinery. A man seeking work would go to the refinery, go into the lobby, and see a person at a switchboard who acted as information clerk. In response to an inquiry in some form equivalent to an inquiry for the employment agent or department, the information clerk would direct the inquirer to Buzzi's office, and the inquirer would go there. Sometimes an applicant came recommended to Buzzi. An applicant for employment was required to make a written application, which Buzzi would place in a file containing such

applications. When plaintiff first went to see Buzzi plaintiff testified Buzzi said to plaintiff, "You will have to leave your application, because they hire them according to their applications," which meant seniority of application. Plaintiff left a written application. Plaintiff's single witness testified there was always a big bunch in the hall there, trying to get jobs, trying to get to see Mr. Buzzi. After written application was filed, the applicant would be told he would be notified, or something to that effect. Applications were kept on file for six or eight months without renewal, and men were employed in the manner now to be described.

A foreman would want a man or several men—some common labor, some skilled labor, or some of each kind. The foreman would make requisition on the head of his department for what he wanted. The head of the department would send the requisition to the superintendent of the refinery, who could approve or reject. If the superintendent approved, he would send the requisition to Buzzi to be filled. The practice was, for Buzzi to select from the file, cards of applicants longest on file. Buzzi testified: "It was my authority to select someone from our open files according to seniority."

It is necessary to digress here long enough to comment on a method employed in plaintiff's brief in treating the evidence. The sentence just quoted is printed in the brief, but in this way: "It was *my authority* to *select* someone from our open files according to seniority." The jury could take or leave Buzzi's statement. It could not take part of a single sentence, clearly expressing the meaning of the witness, and distort that meaning by ignoring the remainder of what the witness said. There was no testimony that Buzzi had any discretion in picking applications from the file to fill labor requisitions. It might be surmised he could choose between cards of equal seniority, but the practice is not disclosed. As indicated, the brief does quote, as a part of plaintiff's statement of facts, Buzzi's words, which accord with all the evidence on the subject, and what he said is accepted as true.

Buzzi's selections were subject to approval by the department head. He could say, for example, "I don't want this man." In that event, Buzzi would pick the card of another applicant. When an application was approved Buzzi would send for the man. When the man appeared he was required to take a physical examination by a company doctor. After the examination the doctor would give the man a sealed envelope containing the report of the examination,

which the man would deliver to Buzzi. Buzzi could tell from the report whether the physical standard was met. If the report was favorable Buzzi would send the man to the pay-roll clerk, who would put the man on the pay roll, give him a clock card to register his time, and give him a badge permitting him to go into the plant. The man would then be sent to the foreman who had made the requisition, and the foreman would put the man to work.

Men were employed on a day-to-day basis and were paid at a rate per hour according to a wage schedule which was revised from time to time. Buzzi had nothing to do with fixing basis or rate. Foremen had authority to discharge.

Labor in defendant's business was a mobile force. Some common labor was constantly employed about the plant itself, and the men might be kept for long periods, or short periods, often for long periods. Common labor was shifted from job to job, as the company's business required. On extraordinary occasions the men at the plant might be shifted, new men would take their places, and when the job necessitating the shift was completed the members of the plant crew would be returned to the plant. In case of construction work men would be shifted from job to job.

In January, 1933, plaintiff went to Buzzi's office and left a written application for employment, which was placed on file. Plaintiff said he was later requested "to report for work." He reported, but was not given work. He was given a physical examination to see if he was qualified for work. He was qualified, and was given work. He worked as a common laborer at irregular intervals at odd jobs around the refinery for about three months, and was released. In June, 1933, he received a call, reported, was sent to the doctor, and brought back the doctor's report. Plaintiff testified:

"Q. You say Mr. Buzzi examined this report from the doctors that you brought back. A. He did.

"Q. Did he say anything to you about what was in that report? A. He did not.

"Q. Did he say anything to you about hiring you, or not hiring you? A. After he slid it sideways he finished another one or two which was waiting there, then he told me I was turned down on account of my tonsils.

"Q. What did you say? A. I said, is that going to interfere with me working at the Shell Company? He says, with those tonsils in that condition. He says, if you have those tonsils taken out we can give you a job. . . . I said, Mr. Buzzi, I couldn't afford to have my tonsils taken out unless I could get employment enough to pay me to do so. And I asked him about how long he thought this period of work would hang on. He said he expected

about eight or ten months. . . . He said I could have the work as long as it lasted and he thought it would be eight to ten months.

"Q. Did you tell him whether or not you would go get your tonsils out on those conditions? A. I told him I would; it looked like it would pay me to have my tonsils taken out to get the work."

. . . . . . . . . . . . . . .

"Buzzi told him the company was doing some new construction work and putting on a gang of laborers, but that he [plaintiff] did not know to what construction work he [Buzzi] referred."

Plaintiff had his tonsils removed at an expense of $48.50, which he would not have done except for what Buzzi said. Buzzi's account of what was said differs from that of plaintiff, and is not considered.

In due time plaintiff returned to Buzzi's office. Dick Young was the pay-roll clerk. Plaintiff testified Buzzi told him to go to Dick Young, "who signed him up." That meant nothing unless it meant registering plaintiff as an employee, which was part of Young's duty. Young told plaintiff Young would let plaintiff know in a day or two. There was no evidence that any requisition for laborers came to Buzzi or to his office before the latter part of August. In July, Buzzi was succeeded by J. B. Livingston.

After he had his tonsils removed, plaintiff reported for work each morning for two weeks, and afterwards occasionally, but was not given work. Plaintiff testified that within the eight or ten months' period, other men were given work, and some stayed as long as ten months.

The jury found the company entered into a contract with plaintiff wherein it was agreed that if plaintiff would have his tonsils removed defendant would employ him as a laborer in its refinery, the terms being that if plaintiff would have his tonsils removed defendant would give plaintiff eight or ten months' work. The jury further found Buzzi acted as agent for defendant in making the contract, Buzzi had authority to make the contract, and Buzzi had authority to make contracts of employment with laborers for a definite term, extending over several months.

What was the nature of the authority ascribed to Buzzi by the jury? Buzzi could disrupt the company plan for handling its labor problem and institute a new plan. He could render nugatory the established basis on which labor was employed, could override the veto of a department head in the employment of a workman, could nullify power of a foreman or anybody else to discharge, and could bind the company to keep and pay common labor of his selection

for a period of time which he fixed, whatever the need of the company for common labor. Such authority cannot be made out from any of the testimony.

It is not material that during the eight or ten months following removal of plaintiff's tonsils the company did employ men, some of whom were kept for a long time. The question is whether Buzzi could bind the company to keep and pay a man for such time as Buzzi named.

At first plaintiff gave the date of his conversation with Buzzi as in August, 1933, and testimony for the company disclosed its general situation about that time. As indicated, a plant crew was regularly maintained. During the month of July there were twelve construction jobs in progress, eleven of which were ninety-nine percent completed, and the other one was ninety percent completed. Completion would necessarily release men. The testimony for defendant was that construction work in progress could not have afforded employment of common labor for more than thirty days, and the first time common labor was employed after July 1 was the latter part of August. Young testified that the first time common laborers were put on after July 1 was in the latter part of August, at which time he tried to locate plaintiff, but was unsuccessful. Plaintiff's testimony was not substantially different. He said men were put on in August, before three months had elapsed. In rebuttal, plaintiff dated his conversation with Buzzi back to June 24, and amended his petition accordingly, but under the jury's findings, whatever defendant's situation, whether defendant did or did not need or employ men, Buzzi bound defendant to give plaintiff work. Incidentally, it may be said the jury awarded plaintiff the equivalent of pay for eight months' work.

The principal and nobody else confers authority on his agent. How did Buzzi get the authority attributed to him?

As indicated, a definite method prevailed at defendant's refinery for procuring needed common labor. Every function of Buzzi in relation to that method has been described. Buzzi could take and file applications. He could respond to requisitions of foremen by calling on men to report whose applications were on file. He could send men who reported to the doctor for physical examination. If an applicant were qualified, Buzzi could see that the applicant was put on the pay roll by Young and was equipped to report to the foreman making requisition. That was all Buzzi could do.

Defendant's method of employing labor definitely excluded authority of Buzzi to bargain with any applicant for work, particularly in a manner inimical to orderly conduct of the principal's business, and much more with an applicant presently disqualified to work. There was no evidence the principal had ever, by writing, word of mouth, or other manifestation given previous assent that Buzzi might exercise the authority found by the jury. There was no evidence that Buzzi had ever, to the knowledge of the company, varied the established routine, and no authority to do so was proved.

The court gave an instruction relating to apparent authority, a subject not covered by the findings of the jury. Plaintiff mentions but does not discuss apparent authority. Plaintiff does discuss implied authority. Because of the confusion it has created in the law, the term "implied authority" is not used in the Restatement of Agency. According to the Restatement, there is authority, which includes authority to perform acts usually incident to, usually accompanying, or reasonably necessary to exercise of authority. (Restatement, Agency, § 35.) Then there is apparent authority. Each kind is determined by objective, and not by subjective test. "Meeting of minds" is out of date. Authority may be conferred by express language. It may be conferred by other form of manifestation, from which authority may be inferred, but the inference has nothing to do with apparent authority. (Restatement, Agency, § 8, Comment *d*.)

In the argument for implied authority on the part of Buzzi, plaintiff refers to the fact there was no evidence that employment "as long as the work lasted," or "until work is completed," or "until the end of the period of work," or "for eight or ten months," was unusual. The observation is beside the question. The question was, whether Buzzi could bind the company to keep a man as long as work lasted, or for eight or ten months, or for any fixed period, or period presently indefinite but certain to come to an end.

Buzzi had nothing whatever to do with kinds of work, with formation of work crews, with assignment of work, or with length of time men on the pay roll stayed there, once they got on. The result is, conversion of day-to-day employment, subject to discharge, to employment for periods which Buzzi fixed, was not anything incidental to performance of his functions, but was adoption of a new labor policy necessarily producing confusion in the conduct of defendant's business. There would be common labor on the pay roll which could not be taken off.

Plaintiff makes an argument which falls within the classification, "apparent authority." Apparent authority must have its source in conduct of the principal, precisely the same as authority must have its source in conduct of the principal, and must induce conduct of a third person who relies on it.

"Except for the execution of instruments under seal or for the conduct of transactions required by statute to be authorized in a particular way, apparent authority to do an act may be created by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." (Restatement, Agency, § 27.)

What are the facts?

The Shell Petroleum Corporation is a large corporation. It does a large business, and employs many men. It operated a refinery which, it may be assumed, was a big plant. A person seeking employment went there and went in. He saw what he called an "Information bureau," and what plaintiff's witness called a "girl information." He asked for the employment agent and she directed him to Tony Buzzi. Plaintiff's brief, in effect, proposes the question, "What was plaintiff to think about Buzzi?" That is not the question in the case.

So far as extent of authority its concerned, direction by the information bureau to the employment agent meant no more than, for example, "Up one flight, turn to the right, and go to the end of the hall." There plaintiff would find an employment agent, who he might assume could do something about employment, but what?

The defendant could not be responsible for what just anybody, or a person such as plaintiff, might think an employment agent or department might mean. All defendant could be responsible for is what it authorized by manifestation reasonably interpreted. Defendant had made no manifestation warranting an inference Buzzi had supreme authority over employment of common labor, and could do anything he pleased. All defendant had ever manifested to anybody was operation of its system, which excluded any such authority, and plaintiff did not testify he had relied on any notion about Buzzi's authority derived from anything defendant did.

Beyond what has been said, it so happens Buzzi had shown plaintiff in the very beginning something of what he might think. There were restrictions on Buzzi's authority. Employment by defendant was governed by rules. Men were hired only on written application, and according to seniority of application.

Plaintiff filed a written application and went away. Later, he said he was requested to report for work, and he went to Buzzi. Was he hired? He was not. Another rule became operative. Buzzi sent him to a doctor for a physical examination. He took the report of the examination to Buzzi. Buzzi said he had passed, and told him to go to Dick Young. Plaintiff said Buzzi sent him to Dick Young, "who gave him work." Manifestly, what occurred was, that after seeing Dick Young, plaintiff was given work. It is not open to debate that Dick Young, the pay roll clerk, had no work to give. Neither Dick Young nor Buzzi could give a laborer work. Only a foreman who had made an approved requisition and to whom Young sent him, carrying his clock card and wearing his badge, could put him to work.

Plaintiff did work for a time and was then released. A foreman, not Buzzi nor Dick Young, discharged him. Plaintiff did not testify he even thought about whether Buzzi could fix it so he could not be discharged, but if he had thought about it he was not warranted in drawing any inference that Buzzi could do anything more than he did do.

After the lapse of some time plaintiff received a call and went to Buzzi's office. As before, he was required to take a physical examination, and Buzzi told him he was turned down.

The principal had done nothing whatever to give plaintiff any notion of exceptional authority residing with the agent. So far as the testimony shows, plaintiff did not then know of any custom or practice relating to how long men were kept. So far as the testimony shows, plaintiff had never heard of the company making a contract of the kind he says he made with Buzzi. Plaintiff did not testify he was induced to have his tonsils removed by anything the defendant had done in the organization or conduct of its business. So far as the testimony shows, he just relied on what he says Buzzi said. Apparent authority of an agent may not be created by the agent himself by a first attempt to make a contract demoralizing to conduct of the principal's business, the like of which was never before heard of by the principal, nor, so far as the testimony shows, by anybody else in the same business as the principal.

The judgment of the district court is reversed, and the cause is remanded with directions to enter judgment for defendant.